# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 1, 2007

Charles R. Fulbruge III
Clerk

No. 06-50602

HARRY HATHAWAY, Individually and as Personal Representative of the Estate of Jon-Eric Hathaway, Deceased; ERICA HATHAWAY, Individually and as Personal Representative of the Estate of Jon-Eric Hathaway, Deceased

Plaintiffs - Appellants

v.

STEVEN BAZANY

Defendant - Appellee

Appeal from the United States District Court for the
Western District of Texas, San Antonio

Before GARWOOD, JOLLY, and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal raises questions of excessive force under the Fourth Amendment involving the shooting death of a teenage driver by a policeman who was struck by the car as it sped away after a traffic stop. Harry and Erica Hathaway, parents of the teenager, appeal the summary judgment granting police officer Steven Bazany qualified immunity. The Hathaways also appeal the district court's exclusion of expert witness evidence offered in reply to Bazany's summary judgment motion. We hold that the exclusion of evidence was justified and that Bazany, facing a grave threat to personal safety and with only seconds to make a decision, acted reasonably under the circumstances, and

thus meets the requirements for qualified immunity. We therefore AFFIRM the judgment dismissing the case.

I.

Steven Bazany, an officer with the San Antonio Police Department, was providing security for City Hall on the afternoon of April 1, 2003. The San Antonio City Hall is bounded on the north by West Commerce Street and on the east by Flores Street. West Commerce Street, the street on which Bazany was stationed, is four lanes wide and open only to west-bound traffic.

While on Commerce Street—and west of the intersection with Flores Street—Bazany was approached by Marc Vargas, an off-duty Bexar County Sheriff's Deputy. Deputy Vargas stopped his vehicle beside Bazany to report a possible gang altercation occurring farther down Commerce Street, east of the intersection of Commerce and Flores. Officer Vargas told Bazany that a silver Mustang was swerving at a blue car while the occupants of the Mustang were hanging out of a window making gang signs and yelling "Sureño," the name of a well-known gang.

Bazany saw the Mustang stopped at the Flores and Commerce traffic light and facing west with its doors open. Two or three males, the occupants of the silver Mustang, were standing over the blue car, yelling and flailing their arms. In order to get a better view, Bazany walked to the third lane from the south curb of Commerce Street, the lane in which the Mustang was stopped on the other side of the intersection. Bazany then walked east, towards the intersection, at which time the men standing over the blue car returned to the Mustang. The Mustang traveled through the intersection, and Bazany motioned for it to pull over to the south curb of Commerce Street and stop. The Mustang did so. Bazany then entered the southernmost lane so that he could approach the Mustang from the driver's side.

Bazany testified that when he reached a point approximately eight to ten feet from the front right corner of the Mustang, the vehicle suddenly accelerated towards him, turning first to the right, then back to the left, and then finally back towards the center of the roadway as Bazany attempted to get out of the way. When Bazany realized that he was not going to be able to get out of the Mustang's path, he decided to fire his weapon. The Mustang struck Bazany on the left leg, causing him to spin down the side of the vehicle. Bazany did fire his weapon, though he does not know whether he drew and fired before, during, or immediately after he was struck by the Mustang. These events took place, on his account, in the snap of a finger.

The bullet fired by Bazany hit the Mustang's driver, Jon-Eric Hathaway, at a point immediately below Hathaway's lower left shoulder blade, traveled laterally through Hathaway's lungs and heart, and came to rest on the right side of his chest, between his right nipple and armpit. Hathaway died from this wound.

## II.

Harry and Erica Hathaway brought a 42 U.S.C. § 1983 lawsuit against Bazany and the city of San Antonio. The Hathaways claimed that Bazany used excessive force in seizing their son and that the city had failed to train its police officers in the proper use of deadly force. The city filed a motion to dismiss and Bazany filed a motion for summary judgment, claiming an entitlement to qualified immunity. The Hathaways failed to respond to either motion and both were granted by the magistrate judge. The Hathaways subsequently asked for, and were granted, additional time to respond to Bazany's motion for summary judgment.

The Hathaways' response objected to the expert testimony upon which Bazany's motion relied. The response also included the expert testimony of Harry Hathaway, to which Bazany objected. The magistrate judge ruled that

the testimony of both expert witnesses should be excluded. On the basis of the remaining evidence, which was primarily Bazany's own testimony, the magistrate judge held that the Hathaways had failed to show that Bazany had violated Jon-Eric Hathaway's constitutional rights, and granted the motion for summary judgment again. The District Court adopted the magistrate judge's conclusions. The Hathaways now appeal the exclusion of the testimony of their expert and the grant of summary judgment.

## III.

The Hathaways raise two issues on appeal: the exclusion of Harry Hathaway's testimony as an expert witness and the grant of qualified immunity to Bazany. With respect to the expert witness issue, the Hathaways argue that Harry Hathaway has presented all the indicia of reliability required by Fed. R. Evid. 702, including a detailed account of his methodology and his own expert background as a police officer. Bazany, in turn, points to numerous paragraphs in the affidavit that he claims have virtually no evidentiary support and range from purely legal determinations to psychological speculation.

The second issue on appeal, the grant of summary judgment denying the Hathaways' Fourth Amendment claims, is closer. The Hathaways argue that the evidence was sufficient to merit jury consideration. To support this argument, the Hathaways cite alleged inconsistencies in Bazany's deposition, the autopsy report describing their son's injury, and the excluded evidence of their expert. This evidence, the Hathaways argue, supports their theory that Bazany fired at Jon-Eric well after the threat to Bazany's safety had dissipated. Bazany, for his part, notes that no admitted evidence controverts his deposition testimony, and that his deposition evinces a scenario characterized by a threat to both his safety and the safety of others and an extremely limited period of time in which to develop a response to that same threat. These characteristics, on Bazany's account, justify his use of deadly force.

IV.

A.

There is, first of all, a dispute over the proper standard of review to apply to the exclusion of Harry Hathaway's testimony. The Hathaways argue that an abuse of discretion standard is appropriate here, see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999), while Bazany, claiming that the Hathaways failed to preserve their objection to the magistrate judge's order, urges the more restrictive plain error standard of review, see Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc). Both standards give deference to the trial court, however, and both support excluding Harry Hathaway's testimony here.[1]

Assuming that the Hathaways properly preserved their objections, "[w]ith respect to expert testimony offered in the summary judgment context, the trial court has broad discretion to rule on the admissibility of the expert's evidence and its ruling must be sustained unless manifestly erroneous." Boyd v. State Farm Ins. Co., 158 F.3d 326, 331 (5th Cir. 1998). The district court excluded Harry Hathaway's testimony on the ground that he failed to provide an adequate basis to support his conclusions.

Federal Rule of Evidence 702 permits opinion testimony from "a witness qualified as an expert by knowledge, skill, experience, training, or education" if such testimony will assist the trier of fact and "(1) the testimony is based upon

---

[1] That Harry Hathaway is both the father of the decedent and a party to this suit does not affect our analysis. Although Hathaway evidently has an interest in the outcome of this suit, that potential bias is likely not alone grounds for disqualification. See Rodriguez v. Pacificare of Texas, Inc., 980 F.2d 1014, 1019 (5th Cir. 1993) ("Nothing in the Federal Rules of Evidence prohibits a party from serving as an expert witness."). See, e.g., Gideon v. Johns-Manville Sales Corp., 761 F.2d 1129, 1135–36 (5th Cir. 1985) (finding that the alleged bias of a medical doctor with extensive credentials did not foreclose the doctor's ability to qualify as an expert witness). In any case, as the issue of bias was not pursued by the parties and there is ample other reason to support excluding Hathaway's expert testimony, we need not pass upon the relevance of Hathaway's interest in this suit.

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court assigned to trial courts the responsibility of determining whether expert testimony under Rule 702 is "not only relevant, but reliable." Id. at 589. In this gate-keeping role, trial courts make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592–93.

The Daubert opinion lists a number of factors that a trial court may use in determining an expert's reliability. Trial courts are to consider the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community. See id. at 593–94. These factors are not mandatory or exclusive; the district court must decide whether the factors discussed in Daubert are appropriate, use them as a starting point, and then ascertain if other factors should be considered. See Black v. Food Lion, 171 F.3d 308, 311–12 (5th Cir. 1999). But the existence of sufficient facts and a reliable methodology is in all instances mandatory. "[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." Viterbo v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987).

## B.

Harry Hathaway offers little more than personal assurances based on his police experience that his conclusions are so, amply justifying the trial court's exclusion of his testimony both on the basis of insufficient factual support and lack of reliable methodology. Hathaway's qualifications as an expert arise from

his career as a law enforcement officer and special expertise in firearms training. But his primary argument, that Bazany must have been behind the car when he fired his shot, is not based on any discernable training in or use of a scientific methodology suited to the reconstruction of the location of a shooter based on the trajectory of the bullet or location of a shell casing.[2]  Instead, Hathaway relies on a host of unsupported conjectures that falls far short of a methodology.

Hathaway's affidavit states that if Bazany had fired his weapon before or as he was struck by the car, the bullet would have had to enter through the windshield of the Mustang.  Since it did not, Hathaway argues that Bazany must have been behind the car and out of danger when he fired the shot.  But this conclusion is based on supposition.  In essence, Hathaway argues that if Bazany had been holding his gun a particular way, and if the Mustang was facing a particular direction, and if the driver was sitting with a particular posture, then Hathaway's version of the events in question is supported.  Even granting Hathaway these speculative premises, there is no indication of how Hathaway is specifically trained to make these determinations or if the calculations he used in coming to his conclusions are the kind normally used and accepted in forensic reconstruction.

But, what's more, Hathaway does not, because he cannot, offer any specific factual support for the reliability of his initial assumptions.  Bazany's deposition is the primary source for direct evidence of how the shooting transpired, and Bazany was uncertain regarding many details necessary to Hathaway's analysis.

---

[2] Hathaway, after stating his opinion that Bazany was well behind the Mustang at the time of the shooting, justifies his methodological approach by simply stating that he is "trained in performing this kind of analysis and ha[s] done it for over 20 years."  But nothing in Hathaway's background shows specialization related to the kind of detailed forensic reconstruction he attempts in his affadavit.  Cf. United States v. Hicks, 389 F.3d 514, 524–26 (5th Cir. 2004) (upholding admission of shell casing comparison where expert had received FBI training, has a degree in chemistry, had done firearm testing of the particular kind in question for over twenty years, and had relied on well-accepted methods, including authoritative literature produced by the Association of Firearm and Tool Mark Examiners).

The extrapolation that Hathaway does from the physical evidence of the autopsy report and the placement of the shell casing to overcome this evidentiary lack therefore depends on the furtive inclusion of a number of supposed facts not in the record.[3]  Hathaway's testimony therefore has neither the sufficient facts nor the reliable methodology that would warrant its inclusion as evidence.  As a result, the trial court was well within its discretion in excluding Hathaway's affidavit.[4]

## V.

## A.

The Hathaways next claim that the district court erred by adopting the magistrate judge's decision to grant summary judgment.  We review the grant of summary judgment de novo.  Cousin v. Small, 325 F.3d 627, 637 (5th Cir. 2003).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  A genuine issue exists when "the evidence is such that a reasonable jury could

---

[3] For instance, when analyzing what he takes to be the trajectory of the bullet fire by Bazany, Hathaway claims that "[f]rom the top of [Jon-Eric] Hathaway's shoulder which was level with the windowsill of the vehicle to the entrance wound is approximately 7 inches."  But there is no evidence in the record that shows that Jon-Eric Hathaway's shoulder was level with the Mustang's windowsill at the time of the shooting, save an earlier statement by Hathaway that he had observed Jon-Eric sitting in the Mustang on prior occasions.

[4] The other arguments offered by Hathaway consist of completely unsubstantiated factual assertions and legal or psychological opinion, and are therefore easily dismissed. Representative statements include: "From my review of the witness's statements it appears that the driver of the Mustang was doing everything he could to avoid hitting Officer Bazany. In fact it is not even clear that the driver of the Mustang saw Officer Bazany until the last second."; "After reviewing all of the statements, and because of my own experience with similar circumstances, Officer Bazany took the shot after the vehicle hit his legs.  You don't have time to draw a weapon; you are too busy trying to get out of the way.  If a vehicle is coming at you and it is 1 to 3 feet away you [sic] natural reflex is to put out both hands in an attempt to push off the vehicle so it won't hit you."; "In my professional opinion Officer Bazany lost control of his emotions and in a moment of extreme anger he shot the driver of the vehicle because Hathaway had hit him with the Mustang and had scared the #%&*# out of the officer."

return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable inferences are drawn in favor of the nonmoving party, but the nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" Turner v. Baylor Richardson Medical Center, 476 F.3d 337, 343 (5th Cir. 2007) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). In the context of a party asserting immunity in a summary judgment motion, "[t]he moving party is not required to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity. Once the [movant] asserts this affirmative defense, the burden shifts to the plaintiff to rebut it." Cousin, 325 F.3d at 632 (emphasis and second alteration in original) (internal citations and quotation marks omitted). Here, then, the evidentiary burden is on the Hathaways to show that Bazany is not entitled to qualified immunity.

Qualified immunity is designed to protect government officials in limited circumstances: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This understanding of qualified immunity requires courts first to "assess whether a statutory or constitutional right would have been violated on the facts alleged." Flores v. City of Palacios, 381 F.3d 391, 395 (5th Cir. 2004). Only after having found a constitutional violation may a court then consider whether the right in question was clearly established at the time of the violation such that a reasonable person would have known of it. See id. ("[T]he Supreme Court has made clear that we are obliged to go through the first step of the analysis even if the second step shows that the law was not clearly established."). Because we conclude that Jon-Eric Hathaway's constitutional rights were not violated in this

9

case, we have no call to reach the second part of the qualified immunity analysis.[5]

B.

In order to meet the first part of the qualified immunity test—the violation of a constitutional right—the Hathaways argue that excessive force was used against their son. In order to succeed on this claim the Hathaways must first show that Jon-Eric Hathaway was seized within the meaning of the Fourth Amendment. Id. at 396. The Hathaways must then show "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." Williams v. Bramer, 180 F.3d 699 (5th Cir. 1999).

The use of deadly force for apprehension is a seizure subject to the reasonableness requirement of the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1, 7 (1985). Garner defined the circumstances under which the use of deadly force to stop a fleeing suspect is constitutionally reasonable. Id. at 11. Specifically,

> [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

---

[5] Even if we were able to conclude that these facts somehow established a constitutional violation, United States v. Brosseau, 543 U.S. 194 (2004), makes it highly unlikely that the Hathaways could prevail in establishing that Bazany infringed on a clearly established right because of its emphasis on the "'hazy border between excessive and acceptable force,'" id. at 201 (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)), in the context of an officer shooting a suspect in a fleeing car.

Id. at 11–12. The reasonableness of an officer's use of deadly force is therefore determined by the existence of a credible, serious threat to the physical safety of the officer or to those in the vicinity. And, critically, reasonableness in these circumstances "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396–97 (1989). Satisfaction of the first part of the qualified immunity test here turns on whether Jon-Eric Hathaway posed a threat so serious as to justify a reasonable officer in Bazany's position to respond with deadly force. We conclude that the Hathaways have not carried their burden of proof in showing that Bazany acted unreasonably.

Cases addressing suspects fleeing in motor vehicles often focus on the position of the officer relative to the vehicle. For example, in Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005), police fired their weapons at a car that "lurched" toward them, although the officers were not directly in the path of the vehicle and indeed would only have been hit if the car swerved. Id. at 477. The car had been involved in a high speed chase, but was at rest prior to the movement that the officers met with deadly force. Id. In finding the shooting justified, the court focused on a number of factors, including the previous hazardous activity of the car. Id. But central to its analysis were the limited time the officers had to respond and "the closeness of the officers to the projected path of [the] vehicle." Id. at 479. These factors led the court to conclude that the officers were justified in using deadly force. Id. at 481.

The court found, however, that the officers were not justified in firing their weapons at the car after it had passed them and stopped. Id. This finding was based on the court's view that, after the vehicle had passed the officers, the officers had access to new information regarding the perceived threat and should

11

therefore have changed their response accordingly. Id. Notably, then, the later shots by the officers were found unjustified because the officers could have actually perceived the passing of the threat. The court's determination was not based on its own post-hoc judgment about whether the threat had in fact passed.

Proximity and temporal factors have also been relevant in our own circuit in a case involving a police officer who fired his weapon at a truck that "gunned" its engine and accelerated towards the officer. Herman v. City of Shannon, 296 F. Supp. 2d 709, 713 (N.D. Miss. 2003). The truck, pursued by police after failing to comply with a traffic stop, ultimately came to rest as it was attempting to turn around on a country road. Id. at 711. Two patrol cars surrounded it, and the officers exited their patrol cars with their guns drawn. Id. The truck then accelerated towards an officer standing within three feet of the truck. Id. The officer was struck by the truck and fired two shots, injuring a passenger in the truck. Id. The district court found the response to be reasonable, given the officer's limited time to react to an evident threat and our circuit's general acknowledgment that police officers are often required to make instantaneous decisions that ought not be second-guessed merely because other options appear plausible in hindsight. See id. at 713.

Bazany's deposition, which, as we have said, is the only personal account of the event, states that he saw the Mustang accelerate towards him, and that the driver, Jon-Eric, had a "determined look." And, most crucially, Bazany states that the subsequent sequence of events, in which he realized he could not get out of the way, decided to fire, unholstered his gun, was struck, and fired his weapon, occurred in the snap of a finger, so quickly, in fact, that Bazany cannot remember whether he fired his gun before, during, or after he was struck.

Nothing offered in evidence seriously disputes the time frame recounted by Bazany. The autopsy report is consistent with any number of theories of the relative locations of Bazany and Jon-Eric because the crucial information

regarding Jon-Eric's position in the car at the time of the shooting is apparently unknown to all parties. And simply because the autopsy report does not contradict an offered theory does not mean that the theory can also be reasonably inferred from it, any more than it could be inferred from the bare fact that the bullet that killed Jon-Eric Hathaway came from Bazany's gun. The autopsy report is at best "a scintilla of evidence" for the theory that Jon-Eric Hathaway was well past Bazany when Bazany fired. No other specific facts in the record support this theory.

Furthermore, Bazany's failure to remember certain details does not amount to a "well-supported suspicion of mendacity" undermining his credibility. Thomas v. Great Atlantic and Pacific Tea Co., 233 F.3d 326, 331 (5th Cir. 2000). The evidence before us—and the lack of specific facts to the contrary—requires a conclusion that Bazany fired his weapon and was struck by the Mustang in near contemporaneity.

The only remaining question, then, is whether an officer would be justified in firing his weapon when threatened by a nearby accelerating vehicle, even if, owing to the limited time available to respond, the shot was fired when or immediately after the officer was hit.[6] The evidence indicates that Bazany was in close proximity to a car that he had asked to pull over that then accelerated towards him, making perception of a serious threat reasonable. Given the extremely brief period of time an officer has to react to a perceived threat like this one, it is reasonable to do so with deadly force. See Graham, 490 U.S. at

---

[6] The Hathaways also argue that Bazany placed himself in danger by walking in front of the Mustang and that the reasoning of Estate of Starks v. Enyart, 5 F.3d 230 (7th Cir. 1993), precludes granting qualified immunity when an officer creates the hazard in this way. But this reads Enyart much too broadly. In that case, the central dispute involved whether the police officers placed themselves in front of the moving vehicle so that they could prevent it from escaping. Id. at 233. There is no indication here that Bazany was using his body as a barricade.

369–97. It is this brevity, and the coordinate rapid response that it demanded from Bazany, that is the distinguishing factor in this case.

This is not an instance, as in Waterman, where an officer fired after the perception of new information indicating the threat was past. Instead, the entirety of the officer's actions were predicated on responding to a serious threat quickly and decisively. That his decision is now subject to second-guessing—even legitimate second-guessing—does not make his actions objectively unreasonable given the particular circumstances of the shooting. See Stroik v. Ponseti, 35 F.3d 155, 158–59 (5th Cir. 1994) ("'[W]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure'" (quoting Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992))). Because Bazany's actions were objectively reasonable, we conclude that he did not violate Jon-Eric Hathaway's Fourth Amendment rights.

VI.

Because we find the expert testimony of Harry Hathaway properly excluded and, on the evidence before us, no violation of Jon-Eric Hathaway's constitutional rights, the judgment of the district court is

AFFIRMED.