**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 28, 2013

No. 11-60654

Lyle W. Cayce
Clerk

JOHN L. BROWN,

Plaintiff - Appellant

v.

ILLINOIS CENTRAL RAILROAD COMPANY,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, ELROD, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In May 2008, an Amtrak passenger train struck the appellant, John Brown, as he drove his garbage truck across railroad tracks owned and maintained by Illinois Central Railroad Company ("Illinois Central"). Brown sued, claiming that Illinois Central failed to signalize the crossing properly. The district court awarded summary judgment to Illinois Central. We affirm.

**I.**

On an afternoon, John Brown was driving his Mack garbage truck south along County Line Road on his usual route in Copiah County, Mississippi.

No. 11-60654

Robert Purnell, Brown's assistant, was riding on the rear of the truck. Not far behind Brown, a southbound Amtrak passenger train cruised down tracks parallel to County Line Road, tracks that Illinois Central then owned and maintained.

As he had for years, Brown turned right onto Hartley Lane, bearing west toward the railroad tracks about 56 feet ahead. An advance warning sign stood 22 feet from the tracks, followed by a "railroad crossbuck" sign 15 feet from the tracks. About nine seconds after Brown turned onto Hartley Lane, the southbound Amtrak train struck his truck broadside, throwing Brown and Purnell from the truck and tearing it to pieces. Both men sustained serious injuries, the Amtrak train derailed, and a number of passengers suffered minor injury.

Amtrak engineer Mervill Cheatwood and foreman Mark Burris were operating the train at the time of the accident. Both men testified that they saw Brown turn off of County Line Road ahead of them, and that the view between the train and the truck was unobstructed as the truck turned onto Hartley Lane and until impact.[1] Both men also testified that Brown never stopped before he entered the crossing. As soon as Cheatwood realized a collision was inevitable, he applied the train's emergency brake. The train's event data recorder indicates that Cheatwood triggered the brake some 232 to 239 feet from impact. It is undisputed that the Amtrak train was within the federally mandated speed limit at the time of the collision.[2]

---

[1] Burris first saw Brown's truck when it was "right in the process of turning." Cheatwood first saw the truck before it turned onto Hartley Lane, while it was still moving south on County Line Road.

[2] The Amtrak train's event data recorder indicated that the train's maximum speed within the five minutes prior to impact was 80 miles per hour — within the federally mandated speed limit for the Illinois Central tracks.

2

No. 11-60654

George Lewis saw the crash while driving south down County Line Road. Lewis testified that he watched Brown turn onto Hartley Lane ahead of him. Lewis also testified that he heard the Amtrak train blow its horn as it emerged from a tree line well before the Hartley Lane crossing, and that Brown turned onto Hartley Lane and drove onto the tracks without ever stopping.

An accident reconstruction team engaged by Illinois Central prepared photographs that attempt to reproduce Brown's view to the north after he turned onto Hartley Lane. The images show that a motorist approaching the crossing has a clear view of oncoming southbound trains and suggest that Brown should have been able to see the approaching Amtrak train at least 43 feet before he reached the tracks.[3] Illinois Central's accident reconstruction expert testified that when Brown was 62 feet from impact, his sight distance along the tracks was 1200 feet, and that by the time Brown reached the advance warning sign 22 feet from the tracks, his line of sight increased to more than 2600 feet. Brown's liability expert confirmed that at a point on Hartley Lane 25 feet to the east of the crossing, visibility to the north exceeds 2000 feet. Moreover, Brown's accident reconstruction expert testified that the Amtrak train was about 1145 feet from the crossing nine seconds before impact (when Brown began his turn onto Hartley Lane), and that Brown should have been able to see the oncoming train from the advance warning sign.

Nine local residents testified that visibility at the Hartley Lane crossing was adequate to negotiate the tracks safely. Brown himself testified that he had regularly traversed the crossing for years, admitting that "you can see a long

---

[3] The first photograph, taken at a point 43 feet to the east of the tracks, shows the Amtrak train clearly visible at 463 feet from impact. The second photograph, taken 22 feet to the east of the tracks, shows the train clearly visible at 290 feet from impact. The third photograph, taken 14 feet to the east of the tracks, show the train clearly visible at 232 feet from impact. Before the district court, Illinois Central introduced expert testimony that explains the facts and assumptions underlying the photographic reconstruction.

3

way" up the tracks. When Illinois Central's attorney asked Brown why he had not requested his assistant, Purnell, to flag the crossing for him, Brown appeared incredulous:

> Q:   If you've got a helper with you, such as Mr. Purnell . . . and you need his assistance directing you, flagging you to back up, go forward, or whatever, do you ask him and use him for that?
>
> A:   Yes, sir, I would.
>
> ***
>
> Q:   If you felt like you needed his assistance flagging across the railroad tracks, would you ask him?
>
> A:   No sir. Because to go across railroad tracks forward, why would I — why would I ask him to flag me?
>
> ***
>
> Q:   Did you — you're saying you did not need his assistance for going forward across the tracks, correct?
>
> A:   No, sir. In the couple years I've been down there, I haven't had — haven't needed anybody to go forward to go across the railroad tracks.
>
> Q:   Because you can see?
>
> A:   Yes, sir.

Brown and Purnell sued Amtrak and Illinois Central in the Southern District of Mississippi, invoking diversity. Before the district court, Brown and Purnell claimed that (1) Amtrak breached its statutory duty to blow the train's horn continuously within 900 feet of the crossing,[4] and (2) Illinois Central breached its common law duty to make an extrahazardous railroad crossing reasonably safe by installing active signaling devices. In support of their signalization claim against Illinois Central, Brown and Purnell sought to admit testimony from Dr. Gary Long, who intended to testify that the Hartley Lane crossing was extrahazardous and needed active signals.

---

[4] *See* Miss. Code Ann. § 77-9-225. Amtrak's event data recorder indicated that the train began blowing its horn approximately 1170 feet before the crossing, blowing it continuously until impact. A number of witnesses confirmed that the horn sounded for a long period of time prior to the collision. However, two witnesses in the vicinity of the accident testified that they only heard one blast from the train's horn immediately before the collision. Other witnesses testified that they heard only the collision.

No. 11-60654

Amtrak and Illinois Central moved for summary judgment. Illinois Central also moved to exclude Dr. Long's testimony under Federal Rule of Evidence 702. The district judge granted both of Illinois Central's motions but denied Amtrak's motion for summary judgment.[5] Brown's horn claim against Amtrak proceeded to trial and the jury returned a verdict in Amtrak's favor. Brown has accepted the jury verdict and appeals only his signalization claim against Illinois Central. Purnell does not appeal.

## II.

Brown claims that the district court erred by excluding Dr. Long's testimony under Rule 702, complaining that the district court made "no assessment whatsoever . . . in regards to Expert Long's qualifications to testify that the crossing was extrahazardous."

We review a trial court's decision to exclude expert testimony for abuse of discretion.[6] "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[7] As read by *Daubert*, Rule 702 requires trial courts to ensure that proffered expert testimony is "not only relevant, but reliable."[8] To determine whether

---

[5] The district court found a fact issue on Brown's horn claim, reasoning that though Amtrak's event data recorder clearly showed that the Amtrak train had sounded its horn during the statutorily mandated interval, witness accounts conflicted.

[6] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 274 (5th Cir. 1998).

[7] *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (quoting *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)).

[8] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

5

proffered testimony is reliable, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[9]  Ultimately, the trial court must also find an "adequate fit between the data and the opinion proffered."[10]

Dr. Long's preliminary report to the district court concluded that the Hartley Lane crossing is "extraordinarily hazardous or ultrahazardous" and "needs active warning devices."  First, Long observed, the crossing is "extremely narrow, only about 16'-7" wide."  Second, the 115-degree angle of the intersection is "dangerous[ly] skewed."  Third, "the crossing surface [is] not smooth" because of "loose gravel or ballast" scattered on the pavement.   Fourth, the roadway leading up to the crossing is on a "steep incline[]," rising over 2.5 feet in elevation "[w]ithin the short space of 55 feet."  Finally, Long suggested, the crossing fails to satisfy the sight-distance guidelines promulgated by the U.S. Department of Transportation ("USDOT").  However, during cross-examination at the subsequent *Daubert* hearing, Long admitted that visibility from the advance warning and crossbuck signs exceeded the value specified in the guidelines.  When counsel for Illinois Central asked Long "why . . . anybody in this courtroom [should] think that [his] testimony about [the] extra-hazardous nature of the crossing and sight distance and all is reliable," Long responded that "it's based on obviously education and experience."

The district court granted Illinois Central's *Daubert* motion, concluding that Long had failed to articulate a credible methodology to sustain his

---

of reliable principles and methods; and (d) the expert has reliably applied the
principles and methods to the facts of the case.
Fed. R. Evid. 702.

[9] *Daubert*, 509 U.S. at 592–93.

[10] *Moore*, 151 F.3d at 276 (citation omitted) (internal quotation marks omitted).

conclusions.[11] We agree. To establish reliability under *Daubert*, an expert bears the burden of furnishing "some objective, independent validation of [his] methodology."[12] "The expert's assurances that he has utilized generally accepted [principles] is insufficient."[13] In this case, Long professed to base his findings on the standards and customs of the transportation engineering profession. To that end, his preliminary report mentioned a variety of public and private guidelines and publications on roadway design and traffic control devices.[14] However, the report failed to explain how any of these authorities support Long's conclusions relating to the "narrow" pavement, "skewed" angle, "rough" surface, and "steep" incline of the Hartley Lane crossing.[15] Indeed, the USDOT's sight-distance guidelines suggest that visibility at the Hartley Lane crossing was more than adequate.[16] Apparently recognizing the lack of objective support for his findings,

---

[11] *See Brown v. Ill. Cent. R.R. Co.*, No. 3:08-CV-559, slip op. at 13 (S.D. Miss. Mar. 28, 2011) ("Dr. Long apparently intends to proffer an opinion on the standards, customs and practices applicable to professional engineers . . . . However, Dr. Long fails to identify with specificity which standards, customs and practices he contends apply.").

[12] *Moore*, 151 F.3d at 276.

[13] *Id.* (citation omitted).

[14] Among other authorities, Long's report mentions the *Green Book*, the *Manual on Uniform Traffic Control Devices* ("MUTCD"), and the *Traffic Control Devices Handbook*. The *Green Book* is a manual on roadway design published by the American Association of State Highway and Transportation Officials. The MUTCD is published by the U.S. Department of Transportation. The *Traffic Control Devices Handbook* is a supplement to the MUTCD published by the Institute of Transportation Engineers.

[15] Curiously, many of the findings in Long's report *are* supported by detailed references to published standards; however, these findings also happen to be irrelevant to Brown's signalization claim. For instance, Long refers to particular tables and provisions in the MUTCD in his discussion of possible deficiencies in the crossbuck and advance warning signs at the Harley Lane crossing. However, on appeal, Brown does not claim that there were deficiencies in either sign.

[16] Perhaps recognizing that published sight-distance requirements were not his strongest point, Long emphasized that "[t]he minimum safe sight distances are a standard, not a regulation . . . the minimum values must be increased where variations in conditions exist."

No. 11-60654

Long emphasized his own "education and experience," urging that "[c]ontrary to some thinking, standards related to safety do not always have to be adopted by some official agency in order to exist." But we have long held that "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."[17] Long's analysis is transparently subjective and the district court did not abuse its discretion by excluding his testimony.[18]

## III.

Brown next argues that the district court erred in granting summary judgment to Illinois Central. We review a district court's order of summary judgment *de novo,* applying the same standard as the district court.[19] "Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[20]

Under Mississippi law, a railroad company owes the public a duty to signalize railroad crossings. Generally, it can satisfy this duty by complying with certain minimum statutory requirements,[21] including the obligation to place

---

[17] *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir.1987)).

[18] As the district court observed, Long's preliminary report also offered a number of plainly inadmissible legal opinions. For example, Long disputed the local sheriff's report that the speed limit on Hartley Lane was 15 miles per hour, concluding that under his interpretation of Mississippi law, the limit actually defaulted to 65 miles per hour. Long also engaged in a detailed analysis of federal regulations to demonstrate that Illinois Central's common law tort duties were not preempted by federal law.

[19] *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 313 (5th Cir. 2007) (citation omitted).

[20] *Id.* (citation omitted).

[21] *See, e.g., Mitcham v. Ill. Cent. Gulf R.R. Co.*, 515 So. 2d 852, 854–55 (Miss. 1987) (observing that "duties and obligations at railroad crossings . . . [are] predominantly a matter of statutory law" and upholding jury verdict for the defendant railroad company because the company had complied with minimum statutory requirements and the crossing was not

a "railroad crossbuck" sign at a specified distance from the railroad crossing.[22] However, if a railroad crossing is "unusually dangerous" or "extrahazardous," the Mississippi Supreme Court has held that "ordinary care requires the railroad company to meet the peril with unusual precautions," such as gates, lights, or other active signaling devices.[23]

Brown does not assert that Illinois Central failed to maintain the Hartley Lane crossing in accordance with statutory requirements, and the only issue in dispute is whether the crossing was so "unusually dangerous" as to trigger a common law duty to install additional signaling devices. The Mississippi Supreme Court has held that "[t]he test of whether a railroad crossing is unusually dangerous [is] . . . the ability of the traveler to observe the approach of the train from the direction in which it is coming."[24] In cases where the railroad has posted the statutorily mandated railroad crossbuck or other warning signs, "[t]he railroad [is] entitled to assume that approaching motor vehicle drivers would upon seeing the signs slow sufficiently to see whether or not a train was on or near the crossing."[25] For example, in *Mitcham v. Illinois Central Gulf Railroad Co.*, the Mississippi Supreme Court affirmed a lower court's decision that visibility was adequate where a motorist at a crossbuck sign

---

unusually dangerous); *Wilner v. Miss. Exp. R.R. Co.*, 546 So. 2d 678, 681–82 (Miss. 1989) (granting directed verdict to the railroad company, reasoning that the company had complied with the statutory crossbuck requirement and that "nothing about [the] crossing . . . made it deceptively dangerous, or any more dangerous than the hundreds of others in this state").

[22] *See* Miss. Code Ann. § 77-9-247. The railroad company must also clear obstructing vegetation within 300 feet of the crossing's centerline. *See id.* § 77-9-254.

[23] *Ill. Cent. R.R. Co. v. White*, 610 So. 2d 308, 318 (Miss. 1992) (quoting *New Orleans & Ne. R.R. Co. v. Lewis*, 214 Miss. 163, 172, 58 So. 2d 486, 489 (Miss. 1952)); *Donald v. Gulf M. & O. R.R. Co.*, 71 So. 2d 776, 777 (Miss. 1954).

[24] *Irby v. Travis*, 935 So. 2d 884, 897 (Miss. 2006); *Ill. Cent. R.R. Co. v. McDaniel*, 151 So. 2d 805, 811 (Miss. 1963); *Donald*, 71 So. 2d at 777.

[25] *Wilner*, 546 So. 2d at 681–82.

No. 11-60654

15 feet from the subject crossing could see approximately 1955 feet along the railroad tracks.[26]

To be entitled to summary judgment, Illinois Central must show that the Hartley Lane crossing was not "unusually dangerous" as a matter of Mississippi law. Illinois Central faces a high burden, as the Mississippi Supreme Court has held that the question of whether a crossing is "unusually dangerous" should generally be submitted to a jury.[27] However, where photographs and undisputed measurements establish that a driver approaching the crossing would have had an unobstructed view of an oncoming train, the Court has instructed trial courts to grant judgment as a matter of law. For example, in *Illinois Central Railroad Co. v. Burns*, the Court granted a directed verdict to the railroad where photographic evidence and testimony established that a driver entering the subject railroad crossing could see some 1000 feet along the tracks toward the oncoming train.[28] Similarly, in *Illinois Central Railroad Co. v. Smith*, the Court granted a directed verdict to the railroad where photographic evidence and testimony established that a motorist could see roughly 425 feet along the tracks

---

[26] 515 So. 2d at 854; *see also Lowery v. Ill. Cent. Gulf R.R.*, 356 So. 2d 584, 587 (Miss. 1978) (affirming jury verdict in favor of railroad where witnesses testified that at a point 15 feet from the crossing, a motorist could see 500 feet along the railroad track toward an oncoming train).

[27] *See, e.g.*, *Ill. Cent. R.R. Co. v. Hawkins*, 830 So. 2d 1162, 1171 (Miss. 2002).

[28] *Burns*, 396 So. 2d at 640. While *Burns* dealt with a private railroad crossing — where a railroad's duties are arguably lower — the Mississippi Supreme Court has applied *Burns* as a measuring stick in public crossing cases. *See, e.g., Hawkins*, 830 So. 2d at 1171 ("In *Illinois Cent. Gulf R.R. v. Burns*, . . . this Court found that a jury verdict against the railroad for negligent maintenance of its right-of-way was against the overwhelming weight of the evidence. In *Burns*, however, it was noted that there was an unobstructed view for more than 1000 feet. The same can not be said for the Mileston crossing.").

No. 11-60654

at a point 350 feet from the crossing, and roughly 1300 feet along the tracks at a point 216 feet from the crossing.[29]

Here, Illinois Central's photographs show that a motorist approaching the Hartley Lane crossing from the east has a clear view of oncoming southbound trains. Moreover, Brown's own experts testified that visibility to the north exceeds 2000 feet at a point 25 feet from the tracks, and that the Amtrak train was 1145 feet from the crossing when Brown began his turn onto Hartley Lane. Brown urges that "the real question is whether the sight distance was adequate beyond 25 feet from a crossing where 80 mph trains are expected." However, Brown is mistaken. Under Mississippi law, Illinois Central was entitled to rely on the fact that Brown would surveil the tracks upon reaching the advance warning sign (22 feet from the crossing) or the railroad crossbuck (15 feet from the crossing).[30] Brown's argument is also in tension with Illinois Central's photographs and expert testimony, as well as the testimony of the Amtrak engineer and foreman, which suggest that Brown had an unobstructed view of the Amtrak train as he turned onto Hartley Lane and at all times thereafter.[31]

---

[29] *See Ill. Cent. R.R. Co. v. Smith*, 140 So. 2d 856, 857–58 (Miss. 1962); *see also Wilner*, 546 So. 2d at 682 (granting directed verdict to defendant railroad because "there is nothing about this crossing which made it deceptively dangerous, or any more dangerous than the hundreds of others in this state").

[30] *See Wilner*, 546 So. 2d at 681–82 ("By clear, unmistakable signs and language there was a warning of a crossing. The railroad was entitled to assume that approaching motor vehicle drivers would upon seeing the signs slow sufficiently to see whether or not a train was on or near the crossing."); *Mitcham*, 515 So. 2d at 855 (Miss. 1987) ("Mitcham . . . urges that . . . a motorist should be permitted to drive at the maximum speed limit without regard to the fact that he is approaching a railroad crossing, and that the distance of unobstructed vision should be based on this speed. This contention is wholly without merit and borders on the ridiculous . . . . [A] motorist also ha[s] a duty to look and listen as he approaches a crossing.").

[31] Illinois Central's photographic reconstruction indicates that Brown had a clear view of the train at least 43 feet before reaching the tracks. Moreover, its expert testified that when Brown was 62 feet from impact, his sight distance to the north along the tracks was at least 1200 feet. Brown's own expert testified that the Amtrak train was 1145 feet to the north of the crossing when Brown began his turn onto Hartley Lane. Consistent with the testimony

11

No. 11-60654

As for Brown's suggestion that the train's speed rendered the crossing unusually dangerous, Brown's own expert observed that at a point from the crossbuck 15 feet before the crossing, the view was "adequate . . . to see a train approaching at 80 miles per hour . . . with sufficient time to make an appropriate decision whether to cross the track or wait."

Brown also claims that the district court erred in failing to give due consideration to the many other problems that Dr. Long identified with the crossing. However, even supposing that Long's ruminations on the crossing's "narrow" pavement, "skewed" angle, "rough" surface, and "steep" incline are admissible, the Mississippi Supreme Court recently clarified that such factors are irrelevant to a railroad company's tort duties at public crossings, reasoning that railroad companies "d[o] not have any control over the grade of the crossing, nor any responsibility to change it," and that "[l]ikewise, [they are] not responsible for paving the roads leading to the crossing."[32] Moreover, even if the conditions Long identifies are not irrelevant as a matter of law, Long's report fails to show how they rendered the Hartley Lane crossing "deceptively dangerous, or any more dangerous than the hundreds of other[ crossings in Mississippi]."[33] Illinois Central has established that it is entitled to summary judgment.

## IV.

The judgment of the district court is AFFIRMED.

---

of Illinois Central's and Brown's experts, Amtrak engineer Cheatwood testified that he first saw Brown's truck while it was still moving south on County Line Road.

[32] *Ill. Cent. Gulf R.R. Co. v. Travis*, — So. 3d —, 2012 WL 5951413 at *15–17 (Miss. Nov. 29, 2012) (en banc).

[33] *Wilner*, 546 So. 2d at 682 (granting directed verdict to railroad company).