986 So.2d 247 (2008)
Roy JENKINS, Crystal Jenkins, Stephanie Jenkins, Latasha Jenkins and Ashley Jenkins, Plaintiffs-Respondents,
v.
WILLIS KNIGHTON MEDICAL CENTER d/b/a Willis Knighton Bossier Health Center, Defendant-Applicant.
No. 43,254-CW.
Court of Appeal of Louisiana, Second Circuit.
June 4, 2008.
*248 Watson, Blanche, Wilson & Posner by P. Chauvin Wilkinson, Jr., Baton Rouge, for Defendant-Applicant.
Washington & Wells, LLC by Alex J. Washington, Shreveport, for Plaintiffs-Respondents.
Before WILLIAMS, GASKINS and MOORE, JJ.
GASKINS, J.
In this medical malpractice case involving the erroneous administration of a blood thinner to a patient suffering from a subarachnoid hemorrhage, the trial court denied the hospital's motion for summary judgment as to the Lejeune[1] claims of the patient's family. This court granted the hospital's writ application and docketed the case. We reverse the trial court's denial of summary judgment as to the Lejeune claims.

FACTS
On May 15, 2006, Rosie Jenkins was admitted to the emergency room of the Willis Knighton Bossier Health Center, accompanied by her husband and complaining of pain in her left ear and neck. Within minutes of her arrival, she had a seizure and stopped breathing. The ER doctor, *249 Dr. Carla Rider, was not sure if Mrs. Jenkins was suffering a myocardial infarction (MI)[2] or a subarachnoid hemorrhage (SAH).[3] Dr. Rider ordered preparation of a shot of Lovenox, a blood thinner, in case it was a heart attack; she directed that it not be given until after she examined a chest x-ray. Lovenox is contraindicated for SAH. However, a nurse administered the shot while the doctor was examining the x-ray.
Mrs. Jenkins' husband and daughters were informed of the error and the efforts to remedy it. However, the patient was determined to have suffered an extensive SAH and was declared brain dead. She was removed from life support and died the next day. According to the death certificate, death was caused by an SAH.
A medical review panel (MRP) found that administration of Lovenox by the hospital staff when the doctor ordered it held was a breach of the standard of care. However, it did not find a causal connection between the administration of the drug and Mrs. Jenkins' death. The panel concluded that there was evidence of severe brainstem dysfunction and an extremely poor prognosis even before Lovenox was administered.
In July 2007, Mrs. Jenkins' husband and four daughters filed a wrongful death/survival suit against the hospital. Cross-motions for summary judgment were filed. The evidence submitted by the hospital in support of its motion included deposition excerpts from two of Mrs. Jenkins' treating doctors and two MRP members. Among other things, affidavits from the daughters were submitted in support of the plaintiffs' motion; in the affidavits, they detailed their distress and anguish at being told of the administration of the wrong medication to their mother. However, the plaintiffs submitted no medical evidence to dispute the depositions and affidavits of the doctors presented by the hospital.
A hearing on the motions was held on November 26, 2007. The plaintiffs' motion for summary judgment was denied. The hospital's motion for summary judgment was denied as to the plaintiffs' Lejeune claims under La. C.C. art. 2315.6; all other claims against the hospital were dismissed with prejudice.
The hospital filed an application for a supervisory writ. This court granted the writ and ordered the matter docketed.

LEJEUNE DAMAGES

Law
For a family member to recover for mental anguish or emotional distress, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Lejeune v. Rayne Branch Hospital, supra; Craighead v. Preferred Risk Mutual Insurance Co., 33,731 (La.App.2d Cir.8/25/00), 769 So.2d 112, writ denied, 2000-2946 (La.12/15/00), 777 So.2d 1230. Such damages have been characterized as "bystander" damages because they are restricted to relatives who either view the accident or injury-causing event or come upon the accident scene soon thereafter, not those who merely learn of another's traumatic injury. Lejeune, supra; Trahan v. McManus, XXXX-XXXX (La.3/2/99), 728 So.2d 1273.
*250 La. C.C. art. 2315.6, which was added in 1991 to codify the test for recovery set forth in the Lejeune decision, provides:
A. The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:
(1) The spouse, child or children, and grandchild or grandchildren of the injured person, or either the spouse, the child or children, or the grandchild or grandchildren of the injured person.
(2) The father and mother of the injured person, or either of them.
(3) The brothers and sisters of the injured person or any of them.
(4) The grandfather and grandmother of the injured person, or either of them.
B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.
The Louisiana legislature apparently intended to allow recovery of bystander damages to compensate for the immediate shock of witnessing a traumatic event which caused the direct victim immediate harm that is severe and apparent, but not to compensate for the anguish and distress that normally accompany an injury to a loved one under all circumstances. Trahan, supra.
Appellate courts review summary judgments de novo under the same criteria that govern a district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991); Costello v. Hardy, XXXX-XXXX (La.1/21/04), 864 So.2d 129. A court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(B). Summary judgment procedure is favored and is designed to secure the just, speedy and inexpensive determination of actions. La. C.C.P. art. 966(A)(2); Mosley v. Temple Baptist Church of Ruston, Louisiana, Inc., 40,546 (La.App.2d Cir.1/25/06), 920 So.2d 355. The party opposing summary judgment cannot rest on the mere allegations or denials in his pleadings, but must show that he has evidence which, if believed, could satisfy his evidentiary burden of proof at trial. If he has no such evidence, then there is no genuine issue of material fact, and the movant is entitled to summary judgment. La. C.C.P. art. 966(C)(2); Williams v. Sustainable Forestry 2000, L.L.C., 42,895 (La.App.2d Cir.1/9/08), 974 So.2d 178.

Evidence
In her deposition, Dr. Rider testified that she examined Mrs. Jenkins at about 5:10 a.m., after she seized in the ER triage area. Mrs. Jenkins had stopped breathing. Her pupils were fixed and dilated. She had no corneal reflex or gag reflex, which are brainstem reflexes. On the Glasgow Coma Scale (GCS) she scored a 3, which is the lowest rating. She was intubated and her breathing stabilized. By *251 5:25 a.m., Dr. Rider suspected a stroke or an MI. In case it was an MI, she ordered that a shot of Lovenox be prepared but held until after she visualized a chest x-ray. However, a nurse gave Mrs. Jenkins the Lovenox injection at 5:29 a.m. In Dr. Rider's opinion, Mrs. Jenkins had an SAH in the triage area and the Lovenox did not worsen her condition because she was already brain dead.
Dr. Michael Walton, a cardiologist who was called by Dr. Rider to consult on Mrs. Jenkins' case, testified in his deposition that he feared that she was already brain dead when he first examined her at 6:06 a.m. He confirmed Dr. Rider's testimony that a GCS score of 3 is the lowest possible. He opined that Mrs. Jenkins was brain dead before the Lovenox was administered.[4]
Two MRP members, Dr. William H. Haynie, Jr., a cardiologist, and Dr. Stephen L. Jaffe, a neurologist, submitted affidavits in which they both agreed that administration of Lovenox was a breach of the standard of care because the doctor ordered that the shot be held. However, they were of the opinion that its administration did not affect the ultimate outcome and that Mrs. Jenkins's death was inevitable after her presentation at the ER. The doctors opined that the Lovenox did not cause or contribute to her death or deprive her of a loss of a chance of survival or a better outcome. While it could have possibly increased the bleed size, they found that there was no evidence that the severe medical damage already sustained was exacerbated by the Lovenox.
In his deposition, Mr. Jenkins testified the doctors told him of the medication error and of their efforts to thicken his wife's blood. However, he also stated that no doctor told him about whether or not the blood thinner caused the bleeding. In their affidavits, Mrs. Jenkins' daughters testified about learning of the medication error and their resulting distress. The daughters recounted that the nurses cautioned them to remain calm because their mother could hear them; the nurses also told them that they were going to try to reverse the medication. They were told that their mother was going to undergo brain surgery to try to stop the bleeding. They were later told that no surgery would be performed and that they needed to decide whether to take Mrs. Jenkins off life support. The daughters all stated that they were present when their mother died a few minutes after she was removed from life support.

Discussion
The consensus of the medical evidence was that Mrs. Jenkins was brain dead due to an SAH by approximately 5:10 a.m. and that the administration of the Lovenox at 5:29 a.m. did not cause the SAH or her ensuing death. Additionally, the Lovenox did not worsen her condition or diminish her chance of survival as her condition was so grave and her prognosis so poor that neither recovery nor even survival was possible. As a result, the admitted breach of the standard of care in giving the Lovenox cannot be said to have caused Mrs. Jenkins any medical injury. The hospital argues that since the medical evidence overwhelmingly shows no genuine issue of material fact as to causation, a key element that the plaintiffs would have to prove at trial, it is entitled to summary judgment as a matter of law as to the Lejeune damages. We agree.
*252 La. C.C. art. 2315.6 provides for recovery of damages for a relative, who either viewed an event causing injury to another person or came upon the scene of the event soon thereafter, as a result of their own suffering "as a result of the other person's injury."
In Nelson v. Ruston Longleaf Nurse Care Center, Inc., 32,718 (La.App.2d Cir.2/1/00), 751 So.2d 436, writ denied, XXXX-XXXX (La.4/28/00), 760 So.2d 1175, this court reversed the awarding of Lejeune damages. The plaintiff's elderly and very ill mother suffered from pressure sores, most notably on her right heel, while in the Longleaf nursing home. Ultimately, this condition deteriorated to the point that the mother's right leg had to be amputated. She then lived in another nursing home where she developed a pressure sore on the left foot; again her condition deteriorated and the left leg had to be amputated. Several months after this surgery, she died of heart failure while in the second nursing home. Her daughter sued Longleaf, asserting that both amputations and her mother's death were the result of its negligent case of her mother. The evidence presented at trial demonstrated that the first amputation did not result from any negligence at Longleaf, that the first amputation did not give rise to the second amputation, and that the mother's death was not related to either amputation. While the jury determined that Longleaf breached its duty of care to the mother, it concluded that any such breach did not cause the amputations or her death and made no award of damages as to these matters. However, it did grant the daughter $175,000 in Lejeune damages.
This court held that since the jury determined that Longleaf was not liable for the amputations or the death of the plaintiff's mother, those events could not give rise to Lejeune damages. As to an incident in which the daughter observed the severely deteriorated condition of her mother's heel wound, we declined to consider the issue of whether it qualified as an "accident" or "injury-causing event" as contemplated by Lejeune.[5] Instead we found that the incident could not give rise to Lejeune damages because the plaintiff's mental anguish was neither severe nor debilitating.
In the instant case, the trial court granted summary judgment in favor of the hospital on the issue of medical malpractice toward Mrs. Jenkins. While there was a breach of the standard of care, i.e., the Lovenox injection, the medical evidence presented by the hospital established that the breach did not cause Mrs. Jenkins' condition or worsen it. The plaintiffs have put forth no medical evidence to the contrary. As in the Nelson case, therefore, we find that since the defendant was not liable as a result of the injection, it did not give rise to Lejeune damages on behalf of Mrs. Jenkins' husband and daughters.
See also Williams v. East Baton Rouge Parish School Board, 1997-2645 (La.App. 1st Cir.12/28/98), 723 So.2d 1093, in which a father who saw his son injured during a football game was denied recovery under La. C.C. art. 2315.6 from the defendant school board and high schools, which were found to be not liable for the boy's injuries.
Another requirement of La. C.C. art. 2315.6 is that the claimants' mental anguish or emotional distress must be "severe, debilitating, and foreseeable." A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, *253 chronic depression, phobia, and shock. Lejeune, supra; Norred v. Radisson Hotel Corporation, 950748 (La.App. 1st Cir.12/15/95), 665 So.2d 753. Since the hospital had no liability for Mrs. Jenkins' condition and, consequently, no Lejeune damages arose, we pretermit any discussion as to whether the plaintiffs' distress was severe and debilitating.
We find that the hospital was entitled to summary judgment on the issue of Lejeune damages under La. C.C. art. 2315.6. Accordingly, we reverse the trial court judgment denying the hospital's motion for summary judgment as to the Lejeune claims, and we grant summary judgment in favor of the hospital on all issues.

CONCLUSION
The judgment of the trial court is reversed insofar as it denied summary judgment in favor of Willis Knighton Medical Center on the issue of Lejeune damages. In all other respects, the judgment is affirmed. Costs of this appeal are assessed to the plaintiffs/respondents.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
NOTES
[1] Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La. 1990).
[2] Heart attack
[3] A type of stroke
[4] According to Dr. Walton's case summary in Mrs. Jenkins' medical records, he informed her family that the doctors believed that the seizure she had in the triage area was a sign that she had had an SAH and that the Lovenox was given after the fact, rather than being the cause of the hemorrhage.
[5] The court noted that the incidents in the Longleaf case occurred before Lejeune was codified in La. C.C. art. 2315.6.