BROWN, C.J.
| ] This medical malpractice action arises out of medical treatment and care rendered by physicians in the Pediatric Intensive Care Unit (“PICU”) of the Louisiana State University Health Sciences Center in Shreveport (“LSUHSC-S”) to six-year-old Anna Cathryn Cooper, who was hospitalized with complications caused by E. coli, including sepsis, renal failure, thrombocy-topenia (low platelet count), and possible hemolytic uremic syndrome (“HUS”).[1] During the course of treatment, Anna Cathryn underwent a pericardiocentesis procedure to drain excess fluid which had *891 accumulated in the sac around her heart, and complications resulted, requiring further medical intervention.
In their lawsuit, plaintiffs sought damages for Anna Cathryn for pain and suffering, disfigurement, and loss of enjoyment of life, as well as past and future medical expenses. John and Julie Cooper, the parents, sought loss of consortium damages and bystander damages. A medical review panel of pediatric cardiologists unanimously found a breach of the applicable standard of care. A jury trial was held on September 21-25, 2015, The jury found a breach of the standard of care which caused damages to plaintiffs and awarded damages as follows:
[[Image here]]
Anna Cathrvn Cooper
Pain and Suffering $100,000
Disfigurement $100,000
Loss of Enj oyment of Life $ 50,000
Past Medical Expenses $ 50,000
Future Medical Expenses $ 20,000
John Cooper
Bystander Damages $ 25,000
Julie Cooper
Bystander Damages $25,000
The trial court rendered and signed a judgment in accordance with the jury’s verdict which included the following language:
WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, ' AND DECREED that, in accordance with the jury’s verdict, the Court renders judgment herein in favor of Plaintiffs, John Cooper, Individually and on behalf of the minor child, Anna Cathryn Cooper, and Julie Cooper, and against Defendant, LOUISIANA STATE UNIVERSITY HEALTH SCIENCES CENTER-SHREVEPORT, in the amount of THREE HUNDRED SEVENTY THOUSAND AND NO/100 ($370,000) DOLLARS, together with interest thereon from May 9, 2012, the date of filing of the plaintiffs’ medical review panel complaint with the Division of Administration, and all costs of these proceedings, said costs to be taxed at a later proceeding.
The language in this judgment had been approved by defense counsel prior to its presentation to the judge. However, an error in the above cited language was brought to the attention of defense counsel, who filed a motion for new trial, seeking correction of the judgment. Specifically, defendant sought a separation of Anna Cathryn’s award for future medical expenses from the rest of the damages awarded, and a provision that these expenses would be paid as incurred in accordance with La. R.S. 40:1237.1(F), (L). The trial judge denied the motion for new trial. Defendant has appealed, urging error in the award of bystander damages to both parents and in the .trial judge’s denial of the motion for new trial.
*892 Discussion

Bystander Damage Awards

Much discretion is left to the judge or jury in its assessment of quantum. La. C.C. art. 2324.1. As a determination of fact, the factfinder’s | .-¡assessment of quantum, as well as the appropriate amount of damages, is one entitled to great deference on review. Guillory v. Lee, 09-0075 (La. 06/26/09), 16 So.3d 1104. Thus, an award of damages will be overturned only if we find that the award is contrary to the evidence in the record or otherwise constitutes an abuse of the fact-finder’s discretion. Id.
There are four basic requirements to recover “bystander” damages, or damages for mental anguish or emotional distress suffered as a result of another person’s injury. These requirements are: (1) the claimant must have a specifically enumerated relationship with the injured person; (2) the claimant must have viewed an event causing injury to the injured person or have come upon the scene of the event soon thereafter; (3) the harm to the injured person must have been severe enough that one could reasonably expect the observer to suffer serious mental distress; and (4) the claimant must suffer emotional distress that is severe, debilitating, and foreseeable. La. C.C. art. 2315.6; Trahan v. McManus, 97-1224 (La. 03/02/99), 728 So.2d 1273; Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La. 1990); Jenkins v. Willis Knighton Medical Center, 43,254 (La.App. 2d Cir. 06/04/08), 986 So.2d 247.
Defendant does not dispute that as parents, John and Julie Cooper can assert a claim for bystander damages, or that they viewed an event that caused harm to their daughter Anna Cathryn that was severe enough that could reasonably be expected to cause them to suffer serious mental distress. However, defendant urges that the Coopers failed to prove that their emotional distress was severe, debilitating, and foreseeable; therefore, the jury erred in awarding them bystander damages,
LA non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia, and shock. Lejeune, supra; Jenkins, supra; Held v. Aubert, 02-1486 (La.App. 1st Cir. 05/09/03), 845 So.2d 625; Norred v. Radisson Hotel Corp., 95-0748 (La.App. 1st Cir. 12/15/95), 665 So.2d 753. Recovery for damages under La. C.C. art. 2315.6 does not always require that a clinical diagnosis of a psychiatric disorder be made. Blair v. Tynes, 621 So.2d 591 (La. 1993); Dickerson v. Lafferty, 32,658 (La. App. 2d Cir. 01/26/00), 750 So.2d 432; Dixon v. Mid-South Rail Corp., 580 So.2d 438 (La. App. 2d Cir. 1991), unit denied, 584 So.2d 1160 (La. 1991); Hubbard v. State, 02-1654 (La. App. 4th Cir. 08/13/03), 852 So.2d 1097, writ denied, 03-2818 (La. 12/19/03), 861 So.2d 579.
While there was no medical testimony or diagnosis in this case regarding any emotional distress sustained by John and Julie Cooper as a result of witnessing the injury to Anna Cathryn shortly after her pericar-diocentesis procedure, there was testimony to the effects suffered by the Coopers.
Julie Cooper is Anna Cathryn’s mother. She testified that she and John live in Rayville, Louisiana, and have four children, Anna Cathryn being the next to youngest. In May 2011, Anna Cathryn got sick a few days after attending an end-of-school year party. She had uncontrollable vomiting and diarrhea, so they took her to St. Francis Medical Center, where she remained for four days. Anna Cathryn was diagnosed with E. coli 0157:H7. Because Anna Cathryn’s condition deteriorated, she was transferred to the PICU at LSUHSC-S. Anna Cathryn’s primary health problem *893 at that time was poor kidney function, but there were other issues |Bthat needed addressing. Among her treating physicians at LSUHSC-S were pediatric nephrologists, infectious disease doctors, intensivists, and cardiologists.
By the morning of May 29, 2011, Anna Cathryn had been at LSUHSC-S for a little over a week. That morning, the pediatric intensivist on duty, Dr. Bhandare, told the Coopers that Anna Cathryn’s blood pressure was low, and they were calling in a cardiologist. The next communication they had was from Dr. Jackson, the pediatric cardiologist, who told them that there was fluid around Anna Cathryn’s heart that had to be drained due to its negative effect on her blood pressure.
While the procedure was being performed, Julie and John Cooper were in the seating area by the elevator on the PICU floor. Dr. Bhandare came running down the hall and told them there was a problem, Anna Cathryn’s heart had been punctured, the team was doing chest compressions, and the Coopers needed to see their daughter. Dr. Bhandare took them to Anna Cathryn’s room in the PICU. John walked into the room, then turned around and told Julie not to come inside, so she stayed in the hall right outside the door. She did see them wheeling Anna Cathryn down the hall to the operating room around 2:00 p.m. There was a nurse sitting on the gurney with Anna Cathryn, who was on oxygen.
John told Julie that the doctors had to take Anna Cathryn down to surgery to repair the puncture. Later that night, John told her what he had seen while in Anna Cathryn’s room. The things she saw, heard, and experienced that afternoon caused her to suffer from serious emotional shock. According to Julie Cooper, every time she relives that experience, it is painful. At the time it was going on, it was extremely traumatic and ^unbearable for her to talk or think about. The emotional shock from the experience continues today.
The Coopers first learned that the open heart surgery had been successful and that Anna Cathryn had made it through around 4:00 p.m. that day. They were able to see Anna Cathryn post-op sometime late that afternoon. She was still on the ventilator but would wake up whenever they talked to her.
In testifying about the incident, John Cooper described his and Julie’s panicked run down the hall after Dr. Bhandare once she told them that the pericardiocentesis procedure had to be halted because Anna Cathryris heart had been punctured. John testified that he beat Julie to the PICU room, and upon seeing the total chaos in Anna Cathryn’s room when he walked in, he turned around and told his wife not to come inside because “she couldn’t handle it.”
John testified that he turned back around and saw Anna Cathryn with her head rolled onto the side and it looked like she was staring at the door. He described chaos involving doctors, nurses, and a tremendous amount of blood. He also saw a large African American doctor in the residency who had been involved in Anna Cathryn’s care sitting up on the bed holding Anna Cathryn’s chest open while other doctors worked inside of her chest. Anna Cathryn did not have a pulse for what seemed to be an eternity to John Cooper, but was actually probably eight to ten minutes. He began to pray, and he still cannot visualize what exactly he saw in that room that day. As they were rolling Anna Cathryn out of the room, he told her that the angels were with her and that she was going to be okay. After that, he was in a state of shock, unable to get his composure or speak or respond to friends]and7 family who began to show up at the hospi *894 tal. Later that night, he was able to describe what he had seen to his wife. John testified that what he saw that day in Anna Cathryn’s PICU room is with him every day, some more than others.
John and Becky Hoychick, close family friends of the Coopers, had gone to the hospital after church on May 29, 2011, to stay with John and Julie for the afternoon. On their way to Shreveport, Julie called and talked to John Hoychick; she told him that something had gone wrong during the procedure. As John and Becky were getting off the elevator on the PICU floor, the Hoychicks saw the Coopers in the waiting area. Becky testified that Julie was sitting on the floor between the seats with her head buried between her knees, and John sat close by on a bench. Both Hoychicks testified that the Coopers looked completely terrified and in shock. Neither John nor Julie Cooper was able to communicate what was going on except that John did say that he had been in Anna Cathryn’s room when “it all went bad.” John Hoy-chick further stated that the Coopers were extremely worried and distraught for days after that, preoccupied about the short-term and long-term effects Anna Cathryn would experience as a result of the incident.
Considering the above testimony, we cannot say that the trial court abused its discretion in awarding each parent $25,000 in bystander damages.

Denial of Motion for New Trial

Louisiana jurisprudence mandates that a litigant may seek substantive changes to a judgment only by filing a motion for new trial or a timely application for appeal. Bourgeois v. Kost, 02-2785 (La. 05/20/03), 846 So.2d 692; Lirette v. Wickramasekera, 08-0575 (La. App. 4th Cir. 05/13/09), 13 So.3d 744; Oliver v. Dep’t of Public Safety & Corrections, 94-1223 (La.App. 1st Cir. 06/23/95), 657 So.2d 596. La. C.C.P. art. 1972(1) provides that a new trial shall be granted when the verdict or judgment appears clearly contrary to the law and the evidence. Article 1972 is peremptory; thus, a trial court is obligated to order a new trial if the conditions of art. 1972 are met. Poland v. Poland, 34,085 (La.App. 2d Cir. 12/06/00), 779 So.2d 852. Unless the trial court abuses its discretion in ruling on a motion for new trial, its decision will not be overturned. Dowles v. Conagra, Inc., 43,074 (La.App. 2d Cir. 03/26/08), 980 So.2d 180; Morehead v. Ford Motor Co., 29,399 (La.App. 2d Cir. 05/21/97), 694 So.2d 650, writ denied, 97-1865 (La. 11/07/97), 703 So.2d 1265.
A proposed judgment was prepared by plaintiffs which awarded them, individually and on behalf of Anna Cathryn, a lump sum award of $370,000, which included the jury’s award of $20,000 for future medical expenses. Defense counsel approved the judgment as to form, and the judgment was signed by the trial court on October 1, 2015. Belatedly, defense counsel noticed that the judgment was not in compliance with the statutory requirements of La. R.S. 40:1237.1 (formerly 40:1299.39, it was redesignated as La. 40:1237.1 by H.C.R. No. 84 of the 2015 Regular Session) as it pertains to awards of future medical expenses in medical malpractice judgments against state services providers, so she filed a motion for a new trial seeking an amendment of the judgment.
Plaintiffs opposed the motion for new trial vehemently, contending the judgment did in fact comply with La. R.S. 40:1237.1, but even if the judgment was not properly worded, defendant had waived any objections thereto by approving the judgment prior to the trial court’s signature.
|flThe trial court agreed with the reasoning urged at argument by plaintiffs’ counsel and denied the motion for new trial. *895 We find, however, that the trial court erred in failing to grant defendant’s motion for new trial as it was made to correct an error of law in the judgment.
Louisiana Revised Statute 40:1237.1 provides in part:
(F) Notwithstanding any other provision of the law to the contrary, no judgment shall be rendered and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged' act of malpractice in excess of five -hundred thousand plus interest and costs, exclusive of future medical care and related benefits valued in excess of such five hundred thousand dollars. In claims which may include future medical care and related benefits, the following procedures shall apply:

(1) The court’s judgment or the settlement or compromise shall include a recitation that the patient is or is not in need of future medical care and related benefits and the amount thereof.

(2) If the total amount of the value of the judgment or settlement or compromise is for five hundred thousand dollars, plus interest and costs, exclusive of the value of future medical care and related benefits, all future medical care and related benefits shall be paid in accordance herewith.

(3) If the total amount of recovery, excluding interest and costs but including the amount of future medical care and related beneñts does not exceed five hundred thousand dollars, judgment may be rendered for the total amount and paid by the state as provided by Subsection I of this Section.

(4) The district court from which final judgment issues shall have continuing jurisdiction in cases where future medical care and related benefits are determined to be necessary. Such continuing jurisdiction shall be limited to matters of future medical care and benefits as provided in this Subsection.
(5) Nothing in this Subsection shall be construed to prevent a claimant and the state from entering into a court-approved settlement or agreement I ^whereby future medical care and related benefits shall be provided for a limited period of time or to a limited degree.
(6) If the total amount of recovery awarded against the state, excluding interest and costs but including the amount of future medical care and related benefits, exceeds five hundred thousand dollars, the claimant may make a claim to the office of risk management for all future medical care and related benefits.

(7) Payments for medical care and related beneñts shall be paid by the ofñce of risk management pursuant to Subsection L of this Section, without regard to the ñve hundred thousand dollar limitation imposed in this Subsection.

(8) The court shall award reasonable attorney fees to the claimant’s attorney if the court finds that the office of risk management unreasonably fails to pay for medical care within sixty days after submission of a claim for payment to such benefits together with proper substantiation therefor.
[[Image here]]
(I)
(1) An attorney appointed in accordance with La. R.S. 49:258 shall be designated as the attorney to defend medical malpractice claims filed under this Part.

*896
(2) Any written compromise or settlement effected between the state and the claimant with the approval of legal counsel designated as provided above shall be binding upon the claimant and the state.

[[Image here]]
(L)

(1) All future medical care and related beneñts shall be paid by the office of risk management as are awarded in final judgments, settlements, or compromises in accordance with this Section.

| xi(2) The office of risk management shall review all invoices received for future medical care and related benefits, prepare vouchers or warrants, and evaluate and settle claims relating to the payments of future medical care and related beneñts. In submitting requests for payment, the claimant shall submit the original invoices.
(3) The parties may agree that any amount due for future medical care and related benefits be paid through a reversionary medical trust fund, or the purchase of an annuity contract by the office of risk management for and on behalf of the claimant. (Emphasis added.)
In urging that this Court affirm the trial court’s ruling denying defendant’s motion for new trial which sought to amend the judgment to comply with La. R.S. 40:1237.1, plaintiffs focus only on two portions of the above statute: La. R.S. 40:1237.1(F)(3) and (I). Plaintiffs contend that these two provisions, read together, are authority for the judgment as rendered, i.e., one lump sum award including the amount for future medical expenses. We find no authorization in these two subsections, under the facts and circumstances of this case, which involves a final judgment after a trial on the merits, and NOT a written compromise or settlement as contemplated by subsection (I), for a total disregard of the remaining mandatory provisions setting forth the procedures governing the payment of future medical expenses in an action involving malpractice liability for state services.
We therefore reverse the trial court’s ruling on defendant’s motion for new trial and will amend the trial court’s judgment accordingly.
Conclusion
For the reasons set forth above, we AFFIRM in part, AMEND in part, and, AS AMENDED, RENDER JUDGMENT. Costs of this appeal are to be split equally between the parties.
hzWHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, that, in accordance with the jury’s verdict, the Court renders judgment herein in favor of Plaintiffs, John Cooper, Individually and On Behalf of the Minor Child, Anna Cathryn Cooper, and Julie Cooper, and against Defendant, LOUISIANA STATE UNIVERSITY HEALTH SCIENCES CENTER-SHREVEPORT, in the amount of THREE HUNDRED FIFTY THOUSAND AND NO/100 ($350,-000) DOLLARS, together with interest thereon from May 9, 2012, the date of filing of the plaintiffs’ medical review panel complaint with the Division of Administration, and all costs of these proceedings, said costs to be taxed at a later proceeding (if not already done). FURTHERMORE, in accordance with the jury’s verdict, the Court declares that Anna Cathryn Cooper is in need of future medical care and related benefits in the amount of TWENTY THOUSAND AND NO/100 ($20,000) DOLLARS, to be paid when and as in *897 curred pursuant to La. R.S. 40:1237.1(F)(1), (F)(7) and (L)(1)-(3).

. Hemolytic uremic syndrome is a condition caused by the abnormal destruction of red blood cells. The damaged red blood cells clog the filtering system in the kidneys, which can lead to lddney failure.
As in the instant case, HUS usually develops in children after five to ten days of severe diarrhea caused by infection with certain strains of B. coli bacteria,