# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-30269

United States Court of Appeals
Fifth Circuit

**FILED**

May 14, 2020

Lyle W. Cayce
Clerk

HENRY LEE MALBROUGH, Individually and on Behalf of Anthony Campbell,

      Plaintiff–Appellant

v.

CARROLL J. STELLY, In His Official Capacity as Chief of Police for the Rayne Police Department; PARISH OF ACADIA; WAYNE MELANCON, In His Official Capacity as Sheriff of Acadia Parish; JACKIE BODDYE, Individually and in Her Official Capacity; JOSEPH CREDEUR, Individually and in His Official Capacity; CITY OF RAYNE; SHERIFFS OFFICE ACADIA PARISH; CHRISTOPHER CORMIER, Individually and in His Official Capacity; GEORGE BRAD WARE, Individually and in his Official Capacity,

      Defendants–Appellees

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 10-107-SDD-CBW

Before OWEN, Chief Judge, and HIGGINBOTHAM and WILLETT, Circuit Judges.

PER CURIAM:*

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Anthony Campbell was in his GMC Yukon with two friends outside his home in Acadia Parish, Louisiana when Police arrived to execute a search warrant. Officers surrounded Campbell's vehicle, shouted commands for the occupants to exit, and pulled one of Campbell's friends out onto the ground. Campbell refused to exit, threw his Yukon in reverse, smashed into the police cruiser parked behind him—then switched gears and took a hard-left turn, attempting to flee while surrounded by officers. One officer was either bumped to the ground or fell. The officers fired. And Campbell was hit. Tragically, the bullet, which remains lodged in Campbell's brain, disabled him for life. Campbell's father, Henry Lee Malbrough, on behalf of his son and himself, sues the city, the parish, the police department, the sheriff's office, and a handful of officers. The district court granted Defendants' motion for summary judgment on all claims, finding no constitutional violation, because Campbell posed an immediate threat to the officers and civilian bystanders. We AFFIRM.

I[1]

In January 2009, the Rayne Police Department obtained a search warrant for the home of Anthony Campbell, who was known in the area as a drug dealer.[2] Officers from the Acadia Parish Sheriff's Office and Louisiana State Police assisted the Rayne Police Department in executing the warrant.[3]

---

[1] Our factual recitation largely adopts the district court's statement of facts, which properly views the facts in the light most favorable to Malbrough, as the non-moving party. *See, e.g.*, *Flores v. City of Palacios*, 381 F.3d 391, 394 (5th Cir. 2004) (adopting the district court's findings of fact); *Kinney v. Weaver*, 367 F.3d 337, 376 (5th Cir. 2004) ("[W]e have jurisdiction to accept the facts as assumed by the district court . . . .").

[2] Malbrough argues that, even though the warrant stipulates, "any/all vehicles on the property," the warrant did not, in realty, properly include Campbell's Yukon. But this argument is raised for the first time on appeal, and we do not entertain arguments that were not before the district court. *Pluet v. Frasier*, 355 F.3d 381, 385 (5th Cir. 2004).

[3] The decision of the Rayne Police Department to request help from the Acadia Parish Sheriff's Office and Louisiana State Police was informed in part by information from

No. 19-30269

Malbrough and Defendants tell remarkably different stories. We start with Defendants' version of events.

Defendants contend that all officers, regardless of agency, were wearing either "Class A" law enforcement uniforms or clothing with clear insignia indicating they were police. When the officers arrived, Campbell's GMC Yukon was parked in the driveway. Because of Campbell's darkly tinted windows, the officers could not see inside the vehicle.

The officers surrounded the Yukon and shouted commands for any occupants to exit. Brian Smith, who was in the passenger seat, exited immediately and was handcuffed. Campbell was in the driver's seat, and Ricky Monceaux was in the backseat. Defendants contend that Campbell was repeatedly told to exit with his hands up. Rather than comply, Campbell reached behind the driver's seat for an unknown object. He then suddenly put the vehicle in reverse, accelerated backward, and crashed into a cop car that was intentionally parked behind his Yukon to block his exit. Then, even though several officers had surrounded his vehicle, Campbell revved the engine and made a hard-left turn. Defendants allege that Campbell struck Deputy George Ware[4] of the Acadia Parish Sheriff's Office, who was in front of the vehicle screaming for Campbell to exit.

---

informants that a large shipment of drugs had arrived. It was also informed by an incident at Campbell's home that occurred one month before the shooting that gave rise to this litigation. Defendants contend that Campbell was arrested at his home and admitted to selling drugs out of the house. Drugs and weapons were found. And multiple people were seen attempting to destroy the drugs. Chief Stelly of the Rayne Police Department testified that Campbell attempted to stop the officers from entering by holding his door shut.

[4] Deputy George Brad Ware is sometimes referred to as "Brad Ware" and sometimes as "George Ware" by the parties and district court. Here, we refer to him as "Ware." But Deputy George Ware should not be confused with his nephew, Reserve Officer Adam Ware. When we refer to Officer Adam Ware, we do so by his full name.

3

No. 19-30269

Defendants assert that after seeing Ware struck, and as the Yukon kept moving, the officers believed that Ware was being dragged under the vehicle. The officers fired. Ware was not dragged, nor was he seriously injured. But he did testify that the Yukon struck him, knocked him over, and kept coming at him, which forced him to move out of the way to avoid being run over. Once out of the way of the Yukon, Ware jumped up and began firing at the vehicle. He claims that he attempted to shoot out the tires. Campbell continued driving down the street and came to a stop at an adjoining block next to a graveyard, having been struck by a bullet.

Backseat passenger Ricky Monceaux gave a recorded statement to police shortly after the incident, and he essentially confirmed the officers' telling of the event. Monceaux told police at least twenty times that Campbell "ran over the cop." Monceaux confirmed that Campbell reached behind the seat "like he was trying to hide something." Mounceaux also stated that the police were "doing their jobs professionally" and that "none of the cops were in the wrong."

Monceaux gave a similar statement to Malbrough's counsel a few weeks later. He said that after they pulled up to the house in the Yukon, Smith said that cops were "hitting" the house. The cops then surrounded the Yukon. When Campbell attempted to flee, Monceaux shouted at Campbell to stop, but Campbell accelerated anyway. Monceaux confirmed that the shooting did not start until Campbell had taken a hard left and the cop—apparently Ware—fell in the bushes: "When the cop fell down in the bushes, they started shooting." Monceaux confirmed that all the officers were in uniform. He didn't see anyone in plain clothes until after the shooting.

Malbrough's story is different in some key respects: He claims that most defendants arrived in unmarked vehicles and most wore unmarked uniforms. Campbell testified that he didn't know the officers were police; he thought they

were robbers.[5] Officer Adam Ware failed to announce that he was a police officer when he approached the Yukon. Officer Joseph Creduer approached the Yukon as it was backing into the patrol unit, and he shattered Campbell's driver-side window with a hasp.[6] Malbrough also contends that Ware's testimony about his location contradicts other testimony. Likewise, according to Malbrough, Ware was never struck by the Yukon but merely slipped near bushes, or outside near a kitchen window, depending on the witness.

Malbrough filed this lawsuit individually and on behalf of his son pursuant to 42 U.S.C. § 1983. On behalf of Campbell, he alleged constitutional violations under the Fourth and Fourteenth Amendment as well as various state law claims.[7] On behalf of himself, Malbrough asserted a "bystander" claim against Defendants for the heart attack he suffered on the day of the

---

[5] It should be noted that Campbell's testimony, like many of the other witnesses, occurred six years after the event. And Campbell falters on many important details about the incident. For example, he remembers nothing after he put the Yukon in reverse.

[6] A hasp is a baton-like weapon. And for this proposition—that the window was shattered while Campbell reversed—Malbrough cites to testimony that was not before the district court, and thus, not properly before us. *Pluet*, 355 F.3d at 385. Monceaux, on the other hand, testified that the police punched out the window after the Yukon came to a stop.

[7] In Malbrough's jurisdictional statement of his opening brief on appeal, he asserts violations of Campbell's Fourth, Fifth, Eight, and Fourteenth Amendment rights. But Malbrough's brief only makes constitutional arguments about excessive force, which here are properly analyzed under the Fourth Amendment. And when a claim is properly analyzed under the Fourth Amendment, the Fourteenth is inapplicable. *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach"). Malbrough also claims that Defendants are liable under Louisiana State law for Campbell's injuries. But Malbrough's brief fails to mention *what* state law is applicable. Nor does he cite a single case, statute, or treatise for this proposition. These state law claims on behalf of Campbell are therefore forfeited, along with any constitutional arguments other than excessive force under the Fourth Amendment. *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 489 n.1 (5th Cir. 2018) (noting that inadequately briefed arguments are forfeited).

incident. Defendants moved for summary judgment on all claims, which the district court granted. Malbrough now appeals.

## II

We review a district court's summary judgment ruling de novo. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003). Summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party." *Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc.*, 292 F.3d 471, 478 (5th Cir. 2002). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). And the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. All reasonable factual inferences are drawn in the non-movant's favor. *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III

No. 19-30269

Malbrough alleges that Defendants used excessive force against Campbell. We disagree. The officers' conduct did not constitute excessive force under the Fourth Amendment.[8]

A

To prevail on an excessive force claim, Malbrough must establish: "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ramierez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)). The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Graham*, 490 U.S. at 396. We are required to pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* That second factor is the most important: We must determine whether Campbell "posed an immediate threat to the safety of the officers or others." *Id.* And critically, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in

---

[8] Defendants also collectively assert the defense of qualified immunity. But neither party discusses *which* defendants are entitled to the defense. "Qualified immunity attaches only to officials in their individual, not their official capacities." *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 337 (5th Cir. 2003). Likewise, municipalities are not entitled to qualified immunity. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980). So four of the Defendants (two sheriffs sued only in their official capacities, a city, and a parish) cannot assert the defense. But officers Boddye, Credeur, Cormier, and Ware can. Because we find that no constitutional violation occurred, we need not specifically address the qualified immunity defense. But in any event, qualified immunity does attach to the officers entitled to the defense because there was no constitutional violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (describing prong one of the qualified immunity analysis—"a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right").

7

No. 19-30269

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

B

We first discuss Malbrough's state-created-need theory. Citing a Tenth Circuit case—*Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)—Malbrough argues that our excessive force inquiry must consider whether the officers "created the need to use such force" through their own "reckless or deliberate conduct." Malbrough contends that "the deliberate and reckless actions of law enforcement that took place immediately following their arrival . . . directly contributed to [Campbell's] reaction, which [Defendants] then use as the basis to justify the use of deadly force." Malbrough claims that Campbell did not know that the officers were police. When the cops surrounded Campbell's car with guns, ordering him to exit, he thought he was being robbed. Because the officers were reckless in arriving out of uniform, in mostly unmarked cars, and in approaching his vehicle unannounced, according to Campbell, their own reckless conduct created the need to use deadly force.

But the law of the Fifth Circuit—not the Tenth—applies. And we have rejected the idea that a police officer uses excessive force simply because he has "manufactured the circumstances that gave rise to the fatal shooting." *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992); *Hover v. Brenner*, No. 99-60462, 2000 WL 1239118, at *1 (5th Cir. Aug. 7, 2000) (per curiam) (noting that, "[i]n this circuit, § 1983 liability cannot be premised on the fact that an officer 'creates the need' to use excessive force by failing to follow police procedure").[9] In the Fifth Circuit, the excessive force inquiry zeros in on

---

[9] *See also Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985) ("The constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest. There is no question about

whether officers or others were "in danger *at the moment of the threat* that resulted in the officer's use of deadly force." *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (emphasis in original).

Moreover, even if the Fifth Circuit did recognize something like the Tenth Circuit's state-created-need theory, Defendants would still not be liable. We must draw all reasonable factual inferences in favor of the non-moving party. *Galindo*, 754 F.2d at 1216. And we may not make credibility determinations. But we need not credit evidence that is "blatantly contradicted by the record," especially by video or photographic evidence. *Scott*, 550 U.S. at 380.[10] Here, Malbrough offers testimony taken six years after the event that most of the officers were not in uniform.[11] But Malbrough's own stipulated photographic evidence contradicts this testimony.

Malbrough and Defendants jointly introduced (and heavily cited) the Louisiana State Police Report, which contains photographs of all officers in this lawsuit except for Ware. The photographs show that all officers wore uniforms or clothing with clear police insignia. Trooper Katie Morel testified under oath that none of the officers were allowed to go home or change before being photographed at the Rayne Police Department immediately following the incident. As for Ware, he left the scene in an ambulance and was taken straight to the hospital, so he isn't in the photographs. But the hospital collected his uniform.

---

the fundamental interest in a person's own life, but it does not follow that a negligent taking of life is a constitutional deprivation.").

[10] In *Scott*, the Supreme Court held that the Court of Appeals should not have relied on the plaintiff's version of events when that story was contradicted by videotape. *Scott*, 550 U.S. at 380. We have analyzed still photography similarly to video evidence under the *Scott v. Harris* rubric. *Curran v. Aleshire*, 800 F.3d 656, 663 (5th Cir. 2015).

[11] The three deponents who claimed that at least some police were out of uniform were Campbell, Milson, and Smith.

No. 19-30269

We do draw all *reasonable* factual inferences in favor of the non-movant. *Galindo*, 754 F.2d at 1216 (emphasis added). But considering the photographic evidence, Malbrough's story—based on three depositions taken six years after the event—is wholly contradicted by the record, and no reasonable jury could believe it. Thus, the district court was correct to find that the officers were in uniform. And it was reasonable for the officers to expect Campbell to recognize them as law enforcement and comply with their commands.

Moreover, even if we accepted Malbrough's contradicted assertions at face value, our inquiry focusses on the officers' conduct at the *moment of the threat*—not the manner of their arrival. So even if the officers negligently spooked Campbell, the officers did not act unreasonably if they reasonably believed that Campbell posed an immediate threat to officers or others. The reasonableness of that assessment—whether Campbell posed a threat—is where we turn next.

C

Having disposed of Malbrough's state-created-need theory, we must determine whether it was reasonable for the officers to believe that Campbell posed a threat to the officers near the Yukon or the civilians on the street. The district court answered "yes." And we agree.

In analyzing the reasonableness of the officers' actions, we are guided by *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007). In *Hathaway*, an officer on foot fired his weapon at a car that accelerated toward him. The bullet struck and killed the driver. We emphasized two factors in determining that the officer's use of deadly force was reasonable: (1) the limited time the officer had to respond, and (2) the officer's proximity to the path of the vehicle. *Id.* at 322.[12]

---

[12] We also take note of a case remarkably similar to *Hathaway—Sanchez v. Edwards*, 433 Fed. App'x 272 (5th Cir. 2011) (per curiam). In that unpublished opinion, the court also

We further highlighted "our circuit's general acknowledgment that police officers are often required to make instantaneous decisions that ought not be second-guessed merely because other options appear plausible in hindsight." *Id.* at 321.

Here, we must be mindful of "proximity and temporal factors." *Id.* Malbrough asserts that Ware's location, and whether Ware was ever in a position of danger, are of critical importance in our reasonableness inquiry. That's almost right. Ware's location matters, but it's not relevant whether, in hindsight, he was ever in real danger. We must ask whether it would have *appeared* to a reasonable officer on the scene that Ware, other officers, or bystanders were in danger.

Malbrough questions Ware's location by attempting to point out discrepancies in Ware's testimony with testimony of other officers.[13] Ware claimed to be inside Campbell's house when Ware heard Campbell's Yukon crash into the patrol unit. Ware came running out the backdoor and ended up in front of the Yukon, where, he alleges, he was knocked down and nearly ran over. Malbrough says that's impossible. Because the whole incident took place in a matter of seconds, according to Malbrough, Ware didn't have enough time to get from inside the front of the house to the backyard in the time it took for the Yukon to accelerate forward after backing into the patrol unit.

---

focused its attention on the officers' proximity to the car and the limited time for the officers to react.

[13] The testimony would not help Malbrough in any case, but we also note that much of it is not properly before us because it was introduced for the first time on appeal. *Pluet*, 355 F.3d at 385. In the section of Malbrough's brief dealing with Ware's location, that new evidence includes testimony of Jacoby Grant, Chad Abshire, and Joseph Credeur. Malbrough also attempts to introduce new evidence in the form of Rayne Police Department radio/dispatch log entries and ballistic evidence (bullet casings found in the yard).

The district court saw no trouble with the supposedly competing narratives because the stipulated photographic evidence of Campbell's home and driveway show that Ware could have exited the back door and been immediately in front of the Yukon within one or two steps. But there's another reason Malbrough's alleged discrepancies don't reveal a dispute of material fact: No one contends that Ware was in the house or otherwise far from the Yukon *at the moment* Campbell took the hard-left turn, attempting to flee the scene. Wherever Ware was when Campbell backed into the patrol unit—and however long it took him to get in proximity to the Yukon—the fact that he *was in proximity* is beyond dispute.

Malbrough needs to show that Ware (as well as the other officers and bystanders) were far enough away from the Yukon and its path, as it moved forward, that no reasonable officer could have thought anyone was in danger. Like the district court, we have no trouble believing Ware was able to reach the Yukon quickly from inside the house. But Malbrough's evidence, at best, would simply indicate that Ware was mistaken about his location when he heard the Yukon smash into the patrol unit. And his location at that precise moment is completely irrelevant.

Next, Malbrough insists that, contrary to the officers' story, Ware was never struck by the Yukon. He merely fell. But even assuming that Ware wasn't struck but rather fell by the bushes, the record is clear that: (1) Ware went to the ground near the Yukon; (2) it was announced that an officer was down; and (3) the firing did not take place until the officers saw Ware go to the ground near the fleeing vehicle. As the district court aptly put it, "[o]nce it was announced that an officer was down, it was objectively reasonable for the officers to respond with force in light of the circumstances." *Malbrough v. City of Rayne*, No. 10-107-SDD-CBW, 2019 WL 1120064, at *9 (W.D. La. March 11, 2019). The precise location of Ware vis-à-vis the Yukon, and whether he was

struck by the vehicle, is in dispute. But what's not in dispute is that the officers thought Ware was in danger.[14]

Malbrough also avers that once the vehicle had passed Ware and the other officers, any further shooting was unreasonable. When the officers were out of danger, they should have holstered their weapons. But as the district court noted, the Supreme Court rejected a similar argument in in *Plumhoff v. Rickard*, 572 U.S. 765 (2014). There, a high-speed chase came to a stop after the suspect "spun out into a parking lot and collided with [an officer's] cruiser." *Id.* at 769. The officers then stepped out of their cruisers and banged on the suspect's passenger window, attempting to get him to surrender. But the suspect again punched the gas. *Id.* at 770. One of the officers fired three shots at the suspect's car. *Id.* The suspect sped away, and after the officers were safely out of the pathway of the fleeing car, they fired an additional twelve shots. *Id.*

The Court held that the officers did not act unreasonably: "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* at 777. And the Court found that the threat had not ended precisely because the suspect "never abandoned his attempt to flee." *Id.* The case would be different, the Court noted, "if [the officers] had initiated a second round of shots after the initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight, or if [the suspect] had clearly given himself up." *Id.* The same is true here. The officers were not aware that Campbell was "clearly incapacitated" by a bullet, and Campbell

---

[14] And because Campbell had just reversed into a police car before he took a hard-left turn, the officers could have reasonably believed that any of them who were near the vehicle—not just Ware—were in danger.

No. 19-30269

never stopped his vehicle or gave himself up. The officers continued firing until Campbell's vehicle came to a stop, which was when the threat was over.

It is tragic that Campbell was so severely injured. But we are obligated, in circumstances such as these—"tense, uncertain, and rapidly evolving"—to give allowance "for the fact that police officers are often forced to make split-second judgments" about the amount of force needed to confront a dangerous situation. *Graham*, 490 U.S. at 396–97. We cannot allow the "theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)). Because the officers here reasonably believed that Campbell posed an immediate threat to officers and others, the officers did not use excessive force in violation of the Fourth Amendment.[15]

## IV

The district court did not err in granting summary judgment for Defendants. We AFFIRM.

---

[15] Malbrough also asserts *Monell* claims against the city of Rayne and Sheriff Melancon. But because Malbrough failed to establish a constitutional violation, the city and the sheriff are not liable under *Monell*. A municipality cannot be held liable when its employee did not violate the Constitution. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Likewise, Malbrough brought a bystander claim under Louisiana law for his own alleged injuries. That claim fails for the same reason. Under Louisiana law, a defendant is not liable to a family member under a bystander theory when the defendant is not held liable to the injured party. *Jenkins v. Willis Knighton Med. Ctr.*, 986 So. 2d 247 (La. App. 2 Cir. 6/4/08); *Williams v. East Baton Rouge Parish Sch. Bd.*, 723 So.2d 1093 (La. App. 1 Cir. 12/28/98).